Yes, Your Honor. As you mentioned, Heather Cook, may it please the court for Western Challenger, and I will try to reserve three minutes for rebuttal. This case is on appeal from two summary judgment orders, and we're asking the court to reverse based on the lower court's failure to observe the summary judgment standard. The lower court also refused to consider Western Challenger's negligence claim, and we're asking that the court find that negligence was sufficiently pled to merit consideration. Now, of course, summary judgment is all about the court's view of the non-moving party's facts, so let's look at the narrative that arises from Western Challenger's facts. We have Mr. Moran and Mr. Franklin, the members of Western Challenger, LLC, who are looking to buy a fish tender. They find a vessel in Canada, and they want to bring it back to the United States, and there are a number of requirements for that. They first consult with a documentation expert, Mr. Kim of Kim Marine Documentation. He tells them that they should be sure that the vessel has not been rebuilt in the foreign country, in Canada, and that it measure under 200 gross tons ITC. They next consult with a tonnage expert, Mr. Don Seymour, and Mr. Seymour, they tell him the name of the vessel. They tell him they're concerned about Coast Guard regulations, and Mr. Seymour, it turns out, has already dealt with this vessel. He has information about the vessel. He's consulted with previous potential purchasers and has looked into the ITC issue, and he is aware, based on the emails that we have, that ITC could be a stumbling block for this vessel. He does not mention this. He never discloses this to Mr. Moran or Mr. Franklin. They know nothing about it. Now, they buy the vessel, and eventually they contract with a classification society through Mr. Essex at Morsan Consulting, who's the agent of the society, and he produces a tonnage certificate for them, which includes a tonnage of over 200 ITC, 227 ITC. And when Mr. Moran goes to Mr. Seymour and Mr. Essex and says, what happened? You know, what's going on with this tonnage certificate? They don't say, oh, gosh, that's terrible. We never made any representations to you. ITC is very difficult to change. You've got some thinking to do. They don't say that. They say, hold on, we'll fix it. And their idea for fixing it is that they should say that the house, the superstructure of the vessel has been removed, which will reduce the ITC tonnage to under 200, to 191 ITC. Mr. Moran goes away, thinks about this, and comes back and says, we can't lie to the Coast Guard. Mr. Moran knows that nothing has ever been done to the superstructure of this vessel. Don't lie to the Coast Guard, he says. Lo and behold, Mr. Essex issues the tonnage certificate at under 200 ITC. Now, at this point, Mr. Moran is stuck. He has a tonnage certificate, which he knows is fraudulent. He cannot use this to apply for documentation through the Coast Guard. And, you know, he doesn't have a lot of options. He's got a boat that may have some value, but he knows now that it's not going to qualify, and he's got a fraudulent certificate for it. Can he sell it? Very hard to say. He can't go forward and make his application for documentation. So, you know, he's sort of in limbo at this point. Now, unbidden on August 30th of that same year, Mr. Essex produces another certificate, which he files with the Coast Guard. This certificate has a number of problems, but it does reflect the original ITC tonnage of 227. Well, so at least Mr. Moran knows, you know, he's got to deal with this coast-wise issue. There may be other issues between the certificates, which we can get to. But at this point, he knows he needs to apply for legislative relief. This is his only option. Congress has to tell him that he can have the coast-wise endorsement. And he does so. Once he has his legislative relief, he can make application. And Mr. Kim makes application to the Coast Guard, and the Coast Guard rejects his application. Now, Mr. Kim tells us that it is the Coast Guard's normal practice to accept the Canadian Registry entry for a vessel as proof of foreign rebuild or no foreign rebuild in this case. And if you look at the Canadian Registry, it's at ER 59 to 61, there is a section that says vessel rebuilt, and there's no entry there. The implication here is that the vessel has not been rebuilt foreign. And yet the Coast Guard won't give them the endorsement. And they tell us why. The Coast Guard sends a letter to Mr. Kim and says, in fact, I will quote the letter. It says, the tonnage certificate received with your original submission reflected that alterations were made to the vessel in 2013. Although the transaction is considered an initial documentation, we need to confirm that the alterations to the vessel in 2013 do not prohibit the vessel from being eligible for a fishery endorsement. Now, fishery endorsement, this is foreign rebuild. This is the concern. And that's what the Coast Guard is telling us. Now, what is it that has knocked them off of their normal practice? Well, it's the tonnage certificate. The tonnage certificate says that the vessel was altered in 2013. Now, Mr. Moran knows the vessel wasn't altered in 2013 in any way that affects the foreign rebuild status. He's done some deep framing, certainly, but he's certainly done nothing to affect the ITC. And, you know, the tonnage certificates reflect other changes which would implicate ITC. And it's simply not the case. Mr. Moran gives the Coast Guard a statement of no foreign rebuild. He says, I'm the owner. I haven't made these kind of changes to the vessel. And, you know, is that the end of it? Well, this is another place where the Coast Guard sort of deviates from their usual practice. Typically, they accept owner information. A letter from Mr. Erickson at the Coast Guard at ER-76, he says, under U.S. tonnage regulations and Coast Guard policy, measurement organizations certify substantial alteration dates based on information reported by the owners. Here's the owner reporting information, but the Coast Guard is still not accepting it. Now, I think we can make a pretty good inference as to why that is. The Coast Guard has in front of them the first, well, actually the second, the second June 10th certificate that was issued, the tonnage certificate, stating 191 ITC. And they have in front of them the August certificate stating 227 ITC. And they have a statement from the owner of the vessel saying, there have been no alterations that would affect ITC. You can imagine, this is what the Coast Guard is looking at this going, what's this guy talking about? We can't issue this endorsement. And this is how the tonnage certificates caused, were the proximate cause of the Coast Guard. So what's the breach of contract? Well, there are a couple of breaches of contract, Your Honor. A good example is the issuance of the interim tonnage certificate. Which one is that? So the interim tonnage certificate is the second one. So you remember the first one had the higher ITC, same date, second one with the lower ITC. Now, Mr. Moran has contracted for a tonnage certificate, right, a single tonnage certificate. And as soon as the multiple tonnage certificates, the second tonnage certificate is issued, that's a breach of contract. And you can see why you don't want more than one tonnage certificate. It's not what he contracted for. And there's also the, when the second tonnage certificate was issued, they said the house was open. And one of the things that is in the contract is the obligation to do a confirmatory survey. Now, if you're going to go beyond and issue multiple tonnage certificates, then I would think that you would need to also do the surveys that go with it. If Mr. Essex believed that the house was missing from the vessel when the second tonnage certificate was issued, then he was under an obligation under the contract to confirm in August that that house had been replaced. Nothing of that sort occurred. Mr. Seymour tells us that June 2nd was the last day that he visited the vessel. And so those are, both of those instances are breaches of contract, which led directly to the situation that Western Challenger is in now. Now, I'd like to address the negligence issue, if I may. And a footnote to his second order, the judge explained that he didn't want to consider negligence because the second amended complaint didn't articulate sufficient facts and none of the previous motions or pleadings had addressed it sufficiently. Now, I would direct the court to ER 187. This is the second amended complaint, paragraph 18. And I quote, the defendants failed to exercise reasonable care in advising plaintiff and assessing the vessel. In addition, defendants failed to exercise reasonable care in gathering information as to the modifications to the vessel and in submitting accurate documentation to the Coast Guard. I would also point out that the majority of the filings that plaintiff has made have been responsive pleadings to motions that have been made by the next paragraph of the second amended complaint upon information provided by defendants. That's correct. Suggests negligent misrepresentation. And I'm not saying that there is no claim from negligent misrepresentation, but what I am saying is that there is also a claim for negligence in making these representations on the tenant certificates in not following the Coast Guard requirements for issuing the certificates. These are negligence claims in addition to the negligent misrepresentation claims. And just to finish my thought on the issue of responsive pleadings, responsive pleadings are just that. You're responding to the attacks that the opposing counsel has made. Now, there was no effort to hide the ball here when we got the second summary judgment motion, and it looked like opposing counsel thought they were disposing of all remaining issues. We raised this issue. We said, hey, you know, there's a negligence claim here that hasn't been addressed yet. And, of course, that's the point, that the judge decided not to hear it. But we didn't wait until after summary judgment. We weren't ñ it's not that there was nothing in the previous pleadings, and I could certainly point you to other instances. It's simply that the interpretation up to that point hadn't included negligence and we had not had to defend it. Counsel, I think you earlier indicated you wanted some rebuttal time. Great. Thank you, Your Honor. Ms. Samore. May it please the Court. Molly Henry on behalf of Phil Essex, Morsum Consulting, and Germanusher Lloyd USA. I'll collectively refer to those defendants as the GL defendants. Mr. Samore is separately represented by Mr. Congleton, but he has indicated that he's going to rest on GL's arguments today. I'd like to start by putting this case in context. The Western Challenger is a World War II wooden-hulled minesweeper that was built during the Roosevelt administration. It left for Canada during the Truman administration and is now seeking to come back as a fish-tendering vessel. The crux of the issue today is that no one knows when or where the vessel was converted from a minesweeper to a tender. Counsel, could I just ask a clarifying question? When you say a fish-tendering vessel, does that mean they just pick up the fish from the fishermen and take them? Into the processors on shore, or is there processing contemplated on the vessel? A tender is, generally speaking, and I'm not sure what exactly the Western Challenger had in mind for this particular vessel, but generally what Your Honor described is what a fish tenderer does. It shuttles the fish from the fishing vessels to a processor. A processor is a different type of vessel. Okay, thank you. But the law here is clear. If a vessel has undergone a foreign rebuild under the regulations, it's not eligible for any of the commercial endorsements, to which I'm referring to the coast-wise and the fishery endorsement. The NVDC in this case has refused to issue the fishery endorsement because it can't determine whether the conversion from a minesweeper to a fish-tendering vessel constituted a prohibited foreign rebuild. That's all undisputed. It's similarly undisputed that this vessel has undergone alterations, both in 2013 when Western Challenger brought the vessel to Anacortes and instituted some deep frames in the hull and some tonnage openings in the superstructure, which were intended to reduce the regulatory tonnage, and more importantly, when it was converted. And this conversion, for the record, is not some subtle change to the underdeck equipment. There are visible changes to the superstructure, and you can see when you compare the photos on page two of our answering brief what this vessel looked like as built and what it looks like today. It's a different boat. In 2016, three years after GL issued its final tonnage certificate, plaintiff's tonnage consultant, Mr. Kim, demanded that the Coast Guard Tonnage Division investigate this issue of whether this vessel has, in fact, been altered. And the conclusion of the Tonnage Division's inquiries were that, yes, this vessel has undergone alterations, including an extension of the focsal, an addition of a deckhouse, decking over of a minesweeping reel, and converted cargo spaces. And the Tonnage Division's conclusions are at Supplemental Excerpts of Record 117. The photographs in our answering brief and the Tonnage Division's conclusions highlight the absurdity of Western Challenger's assertion that the NVDC would not have noticed that this vessel had been altered. It would have been a dereliction of the NVDC's regulatory obligations to deny an inquiry into a foreign rebuild on these facts. And we would submit that plaintiff can't survive summary judgment based on implausible speculation about what triggered this inquiry when the NVDC has indisputably a regulatory obligation to make a foreign rebuild inquiry. Now, Western Challenger does a really nice job of trying to make this case about the tonnage certificates and the tonnage oversight findings. But that's not material to deciding this case because the issue here is a documentation issue, not a tonnage issue. GL's certificates didn't change anything. Western Challenger's damages were solidified in April of 2013 when it purchased a vessel that had been converted without doing any due diligence into its rebuild history. And that was despite Mr. Kim's express warnings otherwise. This foreign rebuild issue was like a sleeping dragon that existed before plaintiffs purchased the vessel. And only Mr. Kim knew about it because it's a documentation issue. And he tried to warn Western Challenger. He told Mr. Moran, make sure this vessel hasn't been rebuilt. And Mr. Moran didn't do that. And the plaintiffs had no other conversations with anybody about a rebuild. The dragon awoke when they applied for the fishery endorsement for the first time in October of 2014, more than a year after GL had issued its certificates. And the NVDC is indisputably denying that endorsement today because Western Challenger lacks evidence about this prior conversion. Mr. Kim submitted a declaration, or I should say, Western Challenger submitted a declaration signed by Mr. Kim to Judge Kunauer in the district court below, which stated that the NVDC had initially refused to issue the coastwise endorsement because of conflicting ITC numbers in the certificates. Mr. Kim later admitted in his deposition that that was not true. It never happened. That's at supplemental excerpts of record 27 to 30. Western Challenger never applied to the NVDC for coastwise endorsement because it needed to seek a legislative exemption because the vessel was indisputably over 200 ITC. I think it's worth noting that this is not a case where GL incorrectly noted that a vessel had measured over 200 ITC where the vessel was actually under 200. In that case, if the NVDC had declined to issue a coastwise endorsement, we'd have a problem. But here there's no dispute. The vessel is over 200. They were going to need a legislative exemption for the coastwise endorsement, regardless of what GL's certificate said. The real issue here is the foreign rebuild issue, and it's purely a documentation issue. There are no tonnage thresholds, well, relevant tonnage thresholds with respect to the rebuild issue. Foreign rebuilds are made by the NVDC under 46 CFR 67.177 based on an assessment of the vessel's steel weight tonnage, or in this case the equivalent of steel weight tonnage with a wooden boat. They're not made off of tonnage certificates. Tonnage certificates measure a vessel's volume, not its weight. Those are two very different things. And the same problem arises with respect to Western Challenger's argument about the inclusion of the 213 date as the date of alteration for this vessel. It conflates tonnage with documentation. The 2013 date, first of all, is accurate under the tonnage definition of alteration, which includes any change of 5% or more to either the ITC or regulatory tonnage. Now, there's no dispute that this vessel made alterations to its regulatory tonnage in 2013. That number is accurate. But ultimately, it doesn't matter whether the deep framing and tonnage openings qualified as a substantial alteration on the tonnage certificates because the issue, and plaintiff testified in his deposition, is that the NVDC is only interested in this prior conversion. So the 2013 alterations are not what the NVDC is after. It's after evidence that Western Challenger doesn't have to rule out a foreign rebuild. The key point here is that there's no dispute this vessel has undergone an alteration. It was converted. The NVDC has an obligation to determine whether that conversion was a prohibited foreign rebuild. Are there any exceptions in the regs to the foreign rebuild? No, there are no exceptions. The only avenue around that is a legislative exemption. Around the foreign rebuild issue? That's correct. You can get a legislative? You can get a legislative exemption. So you can get an act passed in Congress, which is what the Western Challenger needed to do with the Coast Wise endorsement. And I'm sure they would have included the Fisheries endorsement if they had known at that point about this conversion issue. But they didn't. And so I understand they're pursuing that legislative relief now. But that's the only avenue around it. Thank you. Now, this case really boils down to how can plaintiffs connect these issues, which they allege exist with the tonnage certificates, with its documentation problem. So it comes down to an argument that these tonnage certificates somehow tipped off the NVDC to do its job, which is to investigate and rule out foreign rebuilds. And to get there, they rely on a very generalized statement by Mr. Kim that, in his experience, the NVDC would normally rely on the absence of a notation of a rebuild in the Canadian Registry. But that doesn't create a genuine issue of material fact as to causation in this case. Putting aside the credibility issues with Mr. Kim's declaration that they're relying on, given his admission that he didn't read it closely and that at least two of the statements in it are inaccurate, this statement is not material or genuine. First, it's not evidence of what the NVDC did in this case. It may be very true that in Mr. Kim's experience a fishing vessel that has left the U.S. Registry, gone to Canada, and is seeking to come back as a fishing vessel, in that case the NVDC would rely on the Canadian Registry statement that there have been no alterations. But Mr. Kim's declaration says nothing about the unusual circumstances in this case, where you have a 70-year-old military vessel that left the U.S. Registry and is seeking to come back as a fish tendering. In fact, at supplemental excerpts of Record 3, Mr. Kim testifies, he's never dealt with a situation like this before. And second, their argument would require this Court to assume that the NVDC otherwise wouldn't have noticed this rebuild issue and would have abdicated in its duties to investigate. The summary judgment standard requires the plaintiff come forward with evidence on which a trier of fact could reasonably conclude in either party's favor. That's what makes the dispute genuine. And plaintiff can't survive summary judgment based on rank speculation that the Coast Guard wouldn't have done its job. That's not plausible argument. And it's important to keep in mind here that Western Challenger isn't arguing that the NVDC shouldn't be inquiring into the foreign rebuild issue here. They're arguing that they may have gotten away with it if alterations weren't noted in our certificates. And in this regard, in their opening brief, counsel discusses a fourth tonnage certificate that they obtained after GL issued its final certificate. They went out to a different classification society, the American Bureau of Shipping, ABS. And ABS issued its own certificate for this vessel. And that assigned only an ITC number. It didn't assign a regulatory number. And as a result, it included no remarks about the alterations that were done in Anacortes in 2013. And it didn't include an alteration date. And Mr. Kim provided this certificate to the tonnage division and said, look, here, this vessel hasn't been altered. Look, ABS's certificate says no alterations. And the result of that, again, which is at supplemental excerpts of Record 116, is that the tonnage division came back and directed ABS to include a note on its certificate that this vessel has undergone alterations affecting tonnage. The timeline is key to deciding this case, which explains why Western Challenger presents the facts in such a jumbled manner. Because when you spend the time to put the facts in the proper order, the inevitable conclusion is that Western Challenger's claims against the GL defendants fail. They were the tonnage guys. Mr. Kim was the documentation expert. Western Challenger had no contact with GL until nearly two months after it purchased this vessel. None of the defendants ever made any promises with respect to the vessel obtaining a fishery endorsement, which has no relevant tonnage parameters. And the foreign rebuild issue has nothing to do with tonnage. These are undisputed, and they're conclusive. The rest is smoke and mirrors. So unless the court has to... But what about the negligence claim, the pure general negligence claim? So the negligence claim was first raised... You read their second amended complaint. It's not entirely clear whether they're alleging negligent misrepresentation or negligence or both. Well, we've conceded and argued the merits of the negligent misrepresentation claim, and that's how the parties proceeded in the court below, as though they had presented just a negligent misrepresentation claim. And it wasn't until after the close of discovery and after the deadline to amend had passed that they raised this negligence claim as sort of a whack-a-mole. You can reasonably read the complaint as alleging a negligence claim. It doesn't need it. I don't think it needs an amendment. Even if you do, the claim is futile because they're looking to... And it succeeds or fails on the same causation of damages argument. They're talking about the certificates, and they can't show that the certificates, in this case, or defendant's conduct caused the damages that they're seeking. And that's the problem they have. So whether they pled it or not, maybe they didn't... What's the duty that it would be predicated on? Well, that's a great question. Obviously, they have pled a negligent misrepresentation claim, which is one form of negligence. The other duties that they have alleged in the complaint, in the Second Amendment complaint, arise strictly out of contract. And so we've submitted that this would be barred by the independent duty doctrine because in order to present a separate negligence claim, aside from the negligent misrepresentation claim, they've got to come out with a duty outside of contract. Otherwise, they're going to fail for the independent duty doctrine. So unless the Court has any further questions, I'm just about out of time. So we ask that the Court affirm summary judgment. Thank you. I have no questions. Thank you. Okay, we'll get rebuttal argument from Ms. Cox. Thank you. It's fun to look at the pictures of the vessel. And nobody disputes that there have been changes to this vessel. It started out as a minesweeper and it ended up as a fish tender. Now, I would remind the Court that as far as a foreign rebuild rule, it's not an absolute rule. The rule is if the change was 7.5% or less of the vessel weight, the vessel is not considered rebuilt in the foreign country. And, in fact, the Coast Guard has discretion to go up to 10% to find that that vessel has not been rebuilt foreign. So just looking at the vessel, particularly with these kind of volume calculations, isn't going to tell you what's going on. And I would also say that the Coast Guard – But isn't it the obligation of the applicant to demonstrate that they qualify for that narrow exception? Yes, Your Honor, but within the Coast Guard's requirements. If it's the Coast Guard's practice to accept the Canadian Registry, then that is what would be expected of the owner. And it's not – you know, characterizing it as some sort of, you know, dereliction of duty to accept this. If you consider this particular vessel, the vessel was built and finished in 1942, served throughout the war. It shows up in the Canadian Registry in 1951 and stays there until 2013 with that notation of no alteration. So, you know, we have maybe 1948 to 1951. The vessel's in the United States. Was it altered in the United States? Well, there's a good chance that it was, especially considering the other evidence that we have. And the evidence that we have states – says that the vessel wasn't altered. And typically this is what the Coast Guard accepts. Whether the GL group thinks that that's the appropriate process or not, that is – the evidence that we have says that that's what the Coast Guard does accept. And just quickly on the credibility of Mr. Kim, credibility issues aren't just that, credibility issues that can be decided by the trial court. On the issue that we're relying on here about the Canadian Registry, he's certainly never wavered on that issue. And I – I also want to make sure that – that I point out that the – the Coast Guard makes clear that they were looking at 2013 alterations and that it was based on these tonnage certificates that they were asking these questions. And there were so many problems with the tonnage certificates that the Coast Guard investigated, right? There was actually an investigation that the tonnage division at the U.S. Coast Guard undertook. And the – the issues with foreign rebuild, this is what caused them to go farther back than 2013. Prior to that, nobody was looking at it because they didn't need to. They already had the evidence that they – that they wanted as far as foreign rebuild. Of course, when you start digging deeper, then, you know, there is no direct evidence for the vessel. But there is a strong inference. Counsel, I'm afraid – I'm afraid you're over your time. Okay. Unless Judge Pius has questions. Thank you, Your Honor. I thank both counsel for their fine arguments. And the question and challenge shall be submitted. Court will take a ten-minute recess.
judges: Gould, Paez, Pregerson